UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDWARD A. MESIK,

        Petitioner,

            CASE NO. 2:11-CV-11216

v.                      JUDGE SEAN F. COX

            MAGISTRATE JUDGE PAUL J. KOMIVES

CINDI S. CURTIN,

        Respondent.[1]

_____/

## REPORT AND RECOMMENDATION

| | | |
|---|---|---|
| I. | RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 |
| II. | REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 |
| | A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 |
| | B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| | C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 |
| | D.    *Limitation on Cross-Examination (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 |
| |      1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 |
| |      2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 |
| | E.    *Evidentiary Claims (Claims II & V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 |
| |      1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 |
| |      2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| |          a. Hearsay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| |          b. Photographs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 |
| | F.    *Prosecutorial Misconduct (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 |
| |      1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |
| |      2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |
| |          a. Cross-Examination of Petitioner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |
| |          b. Presumption of Innocence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 |
| | G.    *Ineffective Assistance of Counsel (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
| |      1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
| |      2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25 |
| | H.    *Vagueness (Claim VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 |
| |      1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 |
| |      2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
| | I.    *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| |      1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| |      2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31 |
| | J.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 |
| III. | NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 |

---

[1]By Order entered this date, Cindi S. Curtin has been substituted in place of Paul Klee as the proper respondent in this action.

I.    RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.   REPORT:

A.    *Procedural History*

1.    Petitioner Edward A. Mesik is a state prisoner, currently confined at the Oaks Correctional Facility in Manistee, Michigan.

2.    On May 15, 2007, petitioner was convicted of first degree felony murder, MICH. COMP. LAWS § 750.316(1)(b); and armed robbery, MICH. COMP. LAWS § 750.529, following a jury trial in the Iron County Circuit Court. The trial court vacated the armed robbery conviction, and sentenced petitioner to a mandatory term of life imprisonment without possibility of parole.

3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.    THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE THAT KYLE REMER HAD BEEN ENCOURAGED BY HIS FRIEND, BRADLEY STARNES, "TO DO WHATEVER HE HAD TO DO" AS A COOPERATING WITNESS. THIS PREVENTED THE DEFENSE FROM CHALLENGING THIS KEY WITNESS' VERACITY BY SHOWING HIS BIAS AND MOTIVE TO FABRICATE TESTIMONY, THEREBY DENYING MR. MESIK HIS DUE-PROCESS RIGHT TO PRESENT A DEFENSE AND SIXTH-AMENDMENT RIGHT TO CONFRONT WITNESSES.

II.   PLAIN ERROR OCCURRED WHEN THE PROSECUTOR IMPROPERLY INTRODUCED INADMISSIBLE DOUBLE HEARSAY WHILE CROSS EXAMINING MR. MESIK.

III.  THE PROSECUTOR COMMITTED MISCONDUCT, WHICH VIOLATED MR. MESIK'S DUE-PROCESS RIGHT TO A FAIR TRIAL.

IV.   DEFENSE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE IN FAILING TO OBJECT TO THE INTRODUCTION OF INADMISSIBLE HEARSAY AND PROSECUTORIAL MISCONDUCT.

2

> V.   THE TRIAL COURT VIOLATED MR. MESIK'S DUE-PROCESS RIGHTS BY ADMITTING GRUESOME PHOTOGRAPHS OF THE DECEDENT THAT SERVED NO PURPOSE OTHER THAN TO SHOCK AND DISGUST THE JURORS.  THE UNFAIR PREJUDICE CREATED BY THE PHOTOGRAPHS SUBSTANTIALLY OUTWEIGHED ANY PROBATIVE VALUE THEY CARRIED.

Petitioner also filed a *pro se* supplemental brief raising the following additional claim:

> APPELLANT'S CONVICTION IS UNCONSTITUTIONAL AND VIOLATIVE OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE THE STATUTE MCL 750.316 DOES NOT DEFINE ANY ELEMENTS OF THE CRIME CHARGED REQUIRING REVERSAL AND DISCHARGE FROM CUSTODY.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Mesik*, 285 Mich. App. 535, 775 N.W.2d 857 (2009).[2]

4.    Petitioner sought leave to appeal these issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Mesik*, 485 Mich. 1127, 779 N.W.2d 514 (2010).

5.    Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on March 25, 2011.  As grounds for the writ of habeas corpus, he raises the six claims that he raised in the state courts.

6.    Respondent filed her answer on October 4, 2011.  She contends that petitioner's claims second and third claims are barred by petitioner's procedural default in the state courts, and that all of the claims are without merit.

7.    Petitioner filed a reply to respondent's answer on November 17, 2011.

B.    *Factual Background Underlying Petitioner's Conviction*

---

[2]The court of appeals initially issued an opinion which did not address petitioner's *pro se* claim. On petitioner's motion for reconsideration, the court issued the opinion cited above, addressing each of the claims raised by counsel and petitioner.

Petitioner's conviction arises from the November 8, 2006, robbery and murder of Darrell

McDonald.  The evidence adduced at trial is accurately summarized in respondent's answer:

The victim, Darrell "Red" McDonald, moved to Iron River, Michigan on November 8, 2006. (TT, Vol II, p 308). Prior to his move to Iron River, Darrell was a patient at the Northpointe Clinic in Iron Mountain. (TT, Vol II, p 308). Three years before, he met Dan Brabant while they were both patients at the clinic. (TT, Vol III, p 109). Brabant often would host parties with a number of people, many of whom were in their late teens or early 20's. (TT, Vol III, p 111). Two of the young people who would spend time at Brabant's apartment were the Petitioner and co-defendant Brad Starnes. (TT, Vol III, p 112).

The Petitioner, co-defendant Starnes, Francis Bartell, Phyllis Campbell, Kyle Remer, Mike White, and Justin Phillips were present at Brabant's apartment on November 8, 2006 when Darrell paid his friend a visit. (TT, Vol III, p 117). Darrell was smoking non-filtered USA Gold cigarettes and had a silver Zippo lighter with a Green Bay Packers emblem. (TT, Vol III, pp 118, 145, 165, 192). At around 10 p.m., Darrell, Campbell, the Petitioner, and co-defendant Starnes left the party to purchase beer at a nearby store. (TT, Vol III, p 186). Darrell bought a twelve-pack of beer and returned to the party. Campbell testified that neither the Petitioner nor Starnes had any money when they went to the store. (TT, Vol III, p 187).

Early in the evening, Joseph Pesta testified that he overheard co-defendant Starnes ask the Petitioner if "he was ready to get rowdy or something." (TT, Vol III, p 143). Later that night, the Petitioner and co-defendant Starnes briefly left the party and were followed out into the hallway by Kyle Remer. There, Remer overheard co-defendant Starnes tell the Petitioner that they were "goin on a mission." (TT, Vol IV, p 341). Specifically, Remer explained that the "mission" was to steal money from Darrell:

Q: What did [defendant] say?
A: He said that Red had a whole bunch of money and that he wanted it.
Q: Did he say how he was going to get it?
A: He said that they were going to rob him. [TT, Vol IV, p 342.]
However, the trio went back upstairs to the party because Darrell was not leaving yet. (TT, Vol IV, p 343).

During the party, all but one of the participants testified that co-defendant Starnes had a black-handled folding knife on his person. These witnesses were Brabant (TT, Vol III, pp 119-120), Joseph Pesta (TT, Vol III, p 140), Bartell (TT, Vol III, p 168), Campbell (TT, Vol III, p 184), and Remer (TT, Vol IV, p 345). Phillips could not recall Starnes having a knife. (TT, Vol III, p 101).

At around midnight, Darrell informed Brabant and the rest of the party-goers that he was ready to leave. Justin Phillips testified that he offered to walk Darrell home, because Darrell was "half drunk" and had trouble walking. (TT, Vol II, p 85). After Darrell and Phillips left the apartment, Francis Bartell testified that the Petitioner and co-defendant Starnes told her that they were also leaving "to go make

4

some money." (TT, Vol III, p 170). The Petitioner and codefendant Starnes left the party and were met outside by Remer, who by then had agreed to act as a lookout while they executed their "mission." (TT, Vol IV, p 350). Phillips testified that while he was walking Darrell home, Remer caught up with them and walked with them to Darrell's apartment. (TT, Vol II, p 89). Phillips and Remer escorted Darrell into his apartment and then Phillips went home for the night. (TT, Vol II, p 92-96).

Once Phillips had left, Remer testified that he met back up with the Petitioner and codefendant Starnes and positioned himself outside of Darrell's apartment as a lookout. (TT, Vol IV, p 354). Remer saw the Petitioner and co-defendant Starnes enter Darrell's apartment, but left about five minutes later because he "didn't want to be the lookout." (TT, Vol IV, pp 355-356). In a recorded jailhouse conversation, the Petitioner admitted to handing the murder weapon to co-defendant Starnes:

> Phone call played: "Female voice: Would your fingerprints be anywhere on the damn weapon?
>
> Male voice [identified as the Petitioner by his sister, Chesta Mesik]: Yeah, I'm the one that gave it to him.
>
> Female voice: You're the one who gave it to him?
>
> [The Petitioner]: Yah, I gave it to him, cause the big knife that I had he gave that to me cause it was too big to be carrying around so I gave him a smaller one.
>
> [TT, Vol IV, p 393.]

The Petitioner then admitted in detail in a recorded jailhouse conversation what he and codefendant Starnes did to Darrell:

> Phone call played: "But, ah, I guess, ah, fuck it. We went there originally just, you know, to take his money and shit, and then I was looking through his room and Brad had him tied up and Brad was in there asking where his stuff was. I come back and he was cutting his fingers trying to get him to talk. I was like, 'Dude, don't do that it's fucked up.' And he's like, he just wouldn't listen to me. I was like, 'Dude, that's enough.' And I grabbed his hand and then he pushed me back and he tilted the Dude's head back and just got him right there. [TT, Vol IV, pp 396-397.]

The Petitioner and co-defendant Starnes returned to Brabant's apartment about 2-3 a.m. that morning. Campbell described how the defendants appeared to be "rattled," while Bartell described them as "distraught. Nervous. Anxious." (TT, Vol III, p 171). Both Campbell and Bartell testified that when they came back, they were smoking Darrell's USA Gold non-filtered cigarettes and had Darrell's Green Bay Packers Zippo lighter. (TT, Vol III, pp 172, 192-193). Brabant testified that he saw the Petitioner and co-defendant Starnes the next day and that they still had Darrell's cigarettes and Green Bay Packers Zippo lighter. (TT, Vol III, pp 125). Campbell noted that they did not have either of these items or the money earlier that evening. (TT, Vol III, p 191).

Campbell left Brabant's apartment with the Petitioner and co-defendant Starnes and went to the Petitioner's sister's house. (TT, Vol III, p 196). The Petitioner and co-defendant Starnes emptied their pockets, and Campbell observed

the cash, Green Bay Packers Zippo lighter, and the Gold USA non-filtered cigarettes. (TT, Vol III, pp 196-197). Between 5-6 a.m., Remer stopped by the Petitioner's house and asked to speak with them. (TT, Vol III, p 198). When Remer arrived, he testified that co-defendant Starnes dragged his thumb across his throat. (TT, Vol IV, p 360). Once outside, the Petitioner and co-defendant Starnes admitted to Remer that they had killed Darrell:

> Q: What did you talk about?
> A: They told me that they killed him.
> Q: Who is "they"?
> A: Brad and Eddie told me that they killed Red.
> Q: What did Mr. Mesik say?
> A: He said that Brad got hit in the head by a monkey wrench. And then Red tried hitting him with a can and his killer instinct came out and he just started stabbing him.
> Q: What did Brad say?
> A: He said the same thing.
> Q: When you heard Mr. Mesik say that who was he talking about when he said his killer instinct came out?
> A: Himself. His killer instinct came out. [TT, Vol IV, pp 361-362.]

Darrell was found dead in his apartment on November 13, 2006, when a police officer entered his apartment to check on his welfare. (TT, Vol II, p 318). Darrell was placed in a reclining chair and his hands and legs were bound. (TT, Vol II, p 318). Dr. David Start, the forensic pathologist assigned to this case, testified that Darrell had suffered 35 separate knife wounds. He had three incised wounds to the neck, the largest of which was a 5 ½ inch wound located above the Adam's apple. (TT, Vol IV, p 244). Darrell was stabbed 29 times in the chest, including two separate stab wounds to the right ventricle of Darrell's heart. Dr. Start referred to these wounds as "very deep injuries". Deep into the sac that surrounds the heart and into the heart. . . . These injuries would be lethal injuries would be associated with internal hemorrhaging as I saw." (TT, Vol IV, pp 248-249). There were also three stab wounds to the abdomen, the most serious of which penetrated into the abdominal cavity and was 3 ½ inches in length from top to bottom. (TT, Vol IV, p 246). Dr. Start concluded that Darrell's death was a homicide. (TT, Vol IV, p 258).

The investigation focused on the Petitioner and co-defendant Starnes almost immediately. After receiving a tip, the police searched the roof of the Miner State Bank and found a blackhandled folding knife with a serrated blade. (TT, Vol II, pp 331-333). In a recorded jailhouse conversation, the Petitioner admitted that this knife was the murder weapon:

> Phone call played: "[The Petitioner]: Yeah, I heard they found the murder weapon, but the news going around town saying it was found by the river is bullshit 'cuz it wasn't by the river, it was on a four-story building, up on the roof.
> Female voice: Why would you even be saying that (inaudible) they didn't find it?
> [The Petitioner]: 'Cuz they did find it. The lawyer already told me

> they found it.
> Female voice: Yea.
> [The Petitioner]: I was gonna, you know, kinda try to throw that in
> there as a bargaining chip to get my shit lowered, but they already got
> all the pieces. They already got everything they want, so it doesn't
> matter what I have." [TT, Vol IV, p 392.]
> The knife tested positive for human blood. (TT, Vol IV, p 278). Neither Darrell nor
> codefendant Starnes could be excluded as the DNA source of that blood. (TT, Vol
> IV, p 309). Darrell's blood was found on co-defendant Starnes cloths, (TT, Vol IV,
> pp 310-311, 316-317). The Petitioner's palm print was found on Darrell's cane. (TT,
> Vol III, p 61). A silver Zippo lighter was found by Chesty Mesik in her home and a
> flat, Green Bay Packers insignia was found in defendant's bedroom.

Answer, at 3-8; *see also*, Def.-Appellant's Br. on Appeal, in *People v. Mesik*, No. 282088 (Mich.

Ct. App.), at 1-9.

C.     *Standard of Review*

       Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

       "[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A

7

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the

8

benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Limitation on Cross-Examination (Claim I)*

Petitioner first claims that the trial court improperly limited his cross-examination and denied him his right to present a defense by preventing him from cross-examining Kyle Remer about a letter written to Remer by Starnes. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

Although the Constitution does not explicitly provide a criminal defendant with the right to "present a defense," the Sixth Amendment provides a defendant with the right to process to obtain witnesses in his favor and to confront the witnesses against him, and the Fourteenth Amendment guarantees a defendant due process of law. Implicit in these provisions is the right to present a meaningful defense. As the Supreme Court has recognized, "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967). "The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the

9

right to have the witness' testimony heard by the trier of fact.  The right to offer testimony is thus grounded in the Sixth Amendment." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988).  Further, the Court has noted that "[t]his right is a fundamental element of due process of law," *Washington*, 388 U.S. at 19, and that "[f]ew rights are more fundamental[.]" *Taylor*, 484 U.S. at 408.  Although the right to present a defense is fundamental, it is not absolute.  Thus, the right must yield to other constitutional rights, *see e.g.*, *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("The Sixth Amendment right of an accused to compulsory process to secure attendance of a witness does not include the right to compel the witness to waive his Fifth Amendment privilege."), or to other legitimate demands of the criminal justice system, *see United States v. Scheffer*, 523 U.S. 303, 308 (1998).

Further, to constitute a denial of the right to present a defense, a trial court's exclusion of evidence must "infringe[] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308.  A "weighty interest of the accused" is infringed where "the exclusion of evidence seriously undermined 'fundamental elements of the defendant's defense' against the crime charged." *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315).  Thus, "'[w]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting court).

The Supreme Court's "Confrontation Clause cases fall into two broad categories:  cases involving the admission of out-of-court statements and cases involving restrictions imposed by law or by the trial court on the scope of cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 18

(1985) (per curiam).  The latter category, which is implicated here, recognizes that "[c]onfrontation means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974).  Thus, in cases where the trial court has restricted cross-examination in some manner, "the Court has recognized that Confrontation Clause questions will arise because such restrictions may 'effectively . . . emasculate the right of cross-examination itself.'" *Fensterer*, 474 U.S. at 19 (quoting *Smith v. Illinois*, 390 U.S. 129, 131 (1968)).

However, the Supreme Court has also explained that the Confrontation Clause does not "guarantee cross-examination that is effective in whatever way and to whatever extent the defense might wish." *Fensterer*, 474 U.S. at 20.  The question is whether the trial court's ruling allowed for "substantial compliance with the purposes behind the confrontation requirement," or, put another way, whether petitioner was "significantly limited in any way in the scope or nature of his cross-examination." *Green*, 399 U.S. at 166.  Thus, "[s]o long as cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on cross-examination." *United States v. Cueto*, 151 F.3d 620, 638 (7th Cir. 1998); *see also*, *United States v. Larranaga*, 787 F.2d 489, 498 (10th Cir. 1986).  Further, even if a restriction on cross-examination amounts to a violation of the confrontation right, such an error may be harmless.  *See  Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

2.      *Analysis*

During cross-examination of Remer, defense counsel asked him if, while in jail, he had received a letter from Starnes telling Remer to "do whatever you had to do."  Trial Tr., Vol. IV, at 375.  The prosecutor objected on hearsay grounds and the trial court sustained the objection, instructing the jury that it could consider the fact that a letter was sent, but not what was written in the letter.  *See id.* at 375-76.  The Michigan Court of Appeals rejected petitioner's claim that this

11

ruling violated his right to present a defense, reasoning:

> [Defendant] had ample opportunity through other testimony and evidence to challenge Remer's credibility and alleged bias against defendant. Defendant was able to show that Remer and Starnes shared a longstanding friendship, that they corresponded during Starne's incarceration, and that Remer had a motive to protect Starnes. The single statement in the letter upon which defendant focuses was little more than a cumulative detail. Furthermore, its probative value was minimal in context: the next three sentences in the letter were, "I don't care if you have to go against me. Like I said, do whatever it takes. It's your life on the line." The trial court's exclusion of the contents of the letter did not in any way impair defendant's right to present a defense, and thus, even if we presume that the exclusion was erroneous, it was harmless.

*Mesik*, 285 Mich. App. at 538, 775 N.W.2d at 860-61.  This determination was reasonable.

There is no doubt that the statements made in Starnes letter constitute hearsay, and there is likewise no doubt that petitioner's right to present a defense does not relieve him from his obligation to comply with the rules of evidence, *see Clark v. Arizona*, 126 S. Ct. 2709, 2731-32 (2006); *Scheffer*, 523 U.S. at 308.  It is true that the Court has held that state hearsay rules may not be applied mechanistically so as to prevent a defendant from presenting evidence fundamental to his defense.  *See Chambers*, 410 U.S. at 302, 313.  However, *Chambers* and its progeny "do not stand for the proposition that a petitioner's due process rights are violated any time a state court excludes evidence that the petitioner believes is the centerpiece of his defense. Instead, the cases . . . stand for the more limited proposition that a defendant's due process rights are violated when a state court excludes important evidence on the basis of an arbitrary, mechanistic, or per se rule, or one that is disproportionate to the purposes it is designed to serve."  *Alley v. Bell*, 307 F.3d 380, 394 (6th Cir. 2002).  In other words, application of the rules of evidence constitute a denial of the right to present a defense only where it "significantly undermine[s] fundamental elements of the accused's defense," *Scheffer*, 523 U.S. at 315–that is, where the application of the evidentiary rules "infringe[s] upon a weighty interest of the accused."  *Scheffer*, 523 U.S. at 308.

12

Here, the exclusion of the letter did not significantly undermine a fundamental element of petitioner's defense. Part of petitioner's defense was that Remer was not credible, because his testimony was motivated by a desire to protect himself and Starnes. However, petitioner was able to elicit ample evidence regarding Remer's motive to testify against petitioner. During direct examination, Remer testified that he was originally charged with unarmed robbery, a 15 year felony, but was allowed to plead guilty to larceny of a building with a "special sentence" of one year in county jail under the Holmes Youthful Trainee Act, which would eventually allow his conviction to be expunged. His testimony was a condition of the plea deal. *See* Trial Tr., Vol. IV, at 367-68. Counsel revisited the implications of this deal on cross-examination. *See id*. at 374-75. Counsel also elicited from Remer that: he was not in the apartment and did not witness the murder, *see id*. at 371; he was friendlier with Starnes and looked to Starnes for protection, *see id*. at 372; and had lied to the police and initially told the police that he did not know what happened, *see id*. at 373-74, 376. During closing argument, counsel extensively reviewed the evidence suggesting that Remer was not credible and that he had a motive to lie to protect both himself and Starnes. *See id*., Vol. V, at 952-54. Further, there was significant evidence against petitioner apart from Remer's testimony, most notably his own inculpatory statements that were recorded. To establish that the trial court's exclusion of evidence "infringe[d] upon a weighty interest of the accused," *Scheffer*, 523 U.S. at 308, petitioner must show that the "'omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting court). In light of the extensive impeachment of Remer by other means, and the significant evidence against him, petitioner cannot make this showing.

For the same reason, petitioner cannot show that the limitation on the cross-examination of

13

Remer violated his Sixth Amendment right to confront the witnesses against him.  A restriction on cross-examination amounts to a denial of confrontation only if it "significantly limited [counsel] in any way  in the scope or nature of his cross-examination." *Green*, 399 U.S. at 166.  As the Sixth Circuit has explained, if the trial court impermissibly restricts cross-examination on motive or bias, relief is still not available if "the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory of bias or improper motive." *Boggs v. Collins*, 226 F.3d 728, 739 (6th Cir. 2000).  Here, as explained above, counsel was able to extensively cross-examine Remer regarding his general credibility and his specific motive to implicate petitioner.  Thus, petitioner cannot show that he was prejudiced by the restriction on his cross-examination.  *See DiBenedetto v. Hall*, 272 F.3d 1, 11 (1st Cir. 2001); *United States v. Cordova*, 157 F.3d 587, 595 (8th Cir. 1998).  Further, because Remer was extensively impeached by other means and because the evidence against petitioner was overwhelming, any error was harmless.  *See generally*, *Van Arsdall*, 475 U.S. at 684 (claim of denial of confrontation based on limitation of cross-examination subject to harmless error analysis).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Evidentiary Claims (Claims II & V)*

        Petitioner next raises two claims challenging the admission of evidence at trial.  In Claim II, petitioner contends he was denied a fair trial by the admission of hearsay statements made by Kyle Remer at the preliminary examination.  In Claim V, petitioner contends that he was denied a fair trial by the introduction of inflammatory photographs.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.[3]

---

[3]Respondent contends that petitioner's second claim, as well as his third claim alleging prosecutorial misconduct, are barred by petitioner's procedural default because he failed to object at trial.  While procedural issues in a habeas case should ordinarily be resolved first, procedural default is

1.    *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws."). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude.  *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987).  "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law.  State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution."  *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993).  As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial."  *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection

---

not jurisdictional, and "judicial economy sometimes dictates reaching the merits of [a claim or claims] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (internal citations omitted); *see also, Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (noting that procedural default issue should ordinarily be resolved first, but denying habeas relief on a different basis because resolution of the default issue would require remand and further judicial proceedings); *Walter v. Maass*, 45 F.3d 1355, 1360 n.6 (9th Cir. 1995). Because it is clear that these claims are without merit, the Court may deny them on this basis without resolving respondent's procedural default arguments.

or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

    2.    *Analysis*

*a. Hearsay*

During cross-examination, the prosecutor asked petitioner several questions based on statements made by Remer at trial or at the preliminary examination. The questioning at issue was set forth by the Michigan Court of Appeals:

> The first improper questioning was as follows:
>
> > Q. But Mr. Remer simply got it wrong when he said to this jury in this courtroom and at a preliminary exam at another hearing under oath that you said we killed him? He's mistaken about that?
> > A. I would say so, yes.
> >     * * *
> > Q. He also talked about, Mr. Remer talked about, his private conversation with Mr. Starnes at the preliminary exam didn't he? Where he had a one-on-one conversation with Mr. Starnes that you were there for, correct?
> > A. I don't recall that.
> > Q. Do you remember the testimony [at the preliminary examination]? If he testified to it or are we making it up? The fact of what he said in court.
> > A. I don't remember that exactly.
> > Q. You don't remember the point where Kyle Remer testified in District Court saying I spoke with Bradley Starnes. He told me that they killed him. You don't remember when he testified to that at the preliminary exam and your attorney was objecting saying you can't use this against Mr. Mesik and there was a slight back and forth and

16

the judge said no we'll only use this against Mr. Starnes. Do you
remember that part?
A. I'm not sure.
Q. Mr. Remer is testifying against Mr. Starnes. And he testified
against Mr. Starnes. Hasn't he?
A. I'm, yes, I guess so.
Q. He's testified that Mr. Starnes has actually taken credit for this
killing saying we killed him. Put himself in jeopardy. This is what
Mr. Remer has testified to, correct?
A. I'll say again I don't exactly recall.
Q. It's in the transcript. Will you take my word for it?
A. If it's in—
Q. Do you want to see it?
A. I guess I could see it, yes.

The transcript was never actually provided. In fact, during oral argument before this
Court, the prosecutor conceded that Remer did not actually make several of the
statements that the prosecutor had attributed to him, including "I spoke with Bradley
Starnes. He told me that they killed him."

*Mesik*, 285 Mich. App. at 539-40, 775 N.W.2d at 861-62. The court of appeals found that the

prosecutor's questions were misleading and improper, but that there was no improper admission of

evidence. *See id.* at 540, 775 N.W.2d at 862. Specifically, the court explained that the first portion

of the questioning was simply based on what Remer had already testified to at trial, and thus was

"no more than a summary of a prior witness's testimony at trial." *Id.* Further, the court explained,

the testimony was not introduced to prove the truth of the matter asserted, but to rebut petitioner's

claim that Remer was biased in favor of Starnes and against petitioner. *See id.* With respect to the

remainder of the questioning, the court of appeals concluded that there was no impermissible

hearsay because petitioner did not confirm any of the prosecutor's assertions. As the court

explained, "the prosecutor's questions are not evidence and therefore cannot be hearsay," and the

jury was properly instructed that the lawyers' questions to the witnesses were not evidence. *See id.*

at 540-41, 775 N.W.2d at 862.

Petitioner cannot show that he was denied a fair trial by the improper admission of hearsay

evidence because, as the court of appeals explained, no hearsay evidence was introduced. Petitioner did not confirm any of the statements made by the prosecutor, and Remer's prior testimony was not introduced as evidence. Regardless of whether the prosecutor's questions deprived petitioner of a fair trial–a separate issue asserted by petitioner in his third claim–no evidence was introduced through the questioning of petitioner that deprived him of a fair trial. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Photographs

Petitioner next argues that he was denied a fair trial by the introduction of photographs of the victim's body at the crime scene. The Michigan Court of Appeals rejected petitioner's claim, reasoning that even though the manner of death was not disputed at trial, "the prosecution is required to prove each element of a charged offense regardless of whether the defendant specifically disputes or offers to stipulate any of the elements," and thus "the prosecution was not relieved of its duty to prove all the elements of first-degree murder, including intent." *Mesik*, 285 Mich. App. at 544, 775 N.W.2d at 864. Because "[t]he photographs were helpful to meet this burden," they were admissible. *Id*. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Under Michigan law, "[i]f photographs are otherwise admissible for a proper purpose, they are not rendered inadmissible merely because they vividly portray the details of a gruesome or shocking accident or crime, even though they may tend to arouse the passion and prejudice of the jury." *People v. Hoffman*, 205 Mich. App. 1, 18, 518 N.W.2d 817, 826 (1994). As a federal constitutional matter, "[t]he admission of relevant photographs of a crime scene or victim, even if gruesome, does not deprive a criminal defendant of a fair trial." *Skrzycki v. Lafler*. 347 F. Supp. 2d 448, 455 (E.D. Mich. 2004) (Gadola, J.); *see also*, *Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th

18

Cir. 1997) (admission of gruesome photographs generally does not "raise[] the specter of fundamental unfairness such as to violate federal due process law."); *Pearl v. Cason*, 219 F. Supp. 2d 820, 830 (E.D. Mich. 2002) (Edmunds, J.) ("[A] challenge to the admission of a gruesome photograph does not present a question of constitutional magnitude."); *cf. Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005). Because the photographs had some probative value on the issue of intent, which was an element of the crimes, their admission did not deprive petitioner of a fair trial. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Prosecutorial Misconduct (Claim III)*

Petitioner next contends that he was denied a fair trial by two instances of prosecutorial misconduct. Specifically, petitioner contends that the prosecutor committed misconduct by: (1) arguing facts not in evidence and mischaracterizing the evidence during the prosecutor's questioning of petitioner; and (2) arguing that the presumption of innocence did not reply. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). *Darden* constitutes "[t]he 'clearly established Federal law' relevant" to a prosecutorial misconduct claim. *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (per curiam). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "[T]he *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case-determinations.'"

19

*Parker*, 132 S. Ct. at 2155 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  In reviewing whether prosecutorial comments deprived a defendant of a fair trial, a court may not consider the remarks in isolation, but must consider the remarks in the context of the entire trial, including the prosecutor's appropriate comments, the court's instructions to the jury, and the evidence presented in the case.  *See Brown v. Payton*, 544 U.S. 133, 144 (2005); *United States v. Young*, 470 U.S. 1, 11 (1985); *Donnelly v. DeChristoforo*, 416 U.S. 636, 645 (1974).  Even on direct review, where AEDPA deference does not apply, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone."  *Young*, 470 U.S. at 11.

2.    *Analysis*

a. *Cross-Examination of Petitioner*

Petitioner first contends that the prosecutor committed misconduct by questioning him about statements made by Remer at the preliminary examination, which in turn related statements made by petitioner and Starnes.  As explained in connection with petitioner's hearsay evidence claim, the Michigan Court of Appeals concluded that the prosecutor's questions were misleading and improper. The court nevertheless rejected petitioner's prosecutorial misconduct claim, concluding that because petitioner "consistently responded that he did not recall" the testimony referenced by the prosecutor, petitioner could not "establish the requisite level of prejudice under the plain error rule." *Mesik*, 285 Mich. App. at 542, 775 N.W.2d at 863.  The Court should conclude that this determination was reasonable.

As noted by the court of appeals, petitioner did not confirm any of the statement referenced by the prosecutor, and thus there was no improper evidence admitted.  The prosecutor's exchange with petitioner was a brief portion of a five-day trial resulting in nearly 1,000 pages of transcripts. Indeed, the prosecutor's cross-examination of petitioner alone account for 45 transcript pages.

There was significant evidence presented against petitioner including, most notably, his undisputed participation in the robbery and his recorded, inculpatory statements regarding the murder. Further, the jury was instructed that the lawyers' questions were not evidence, and the Court must presume that the jury followed this instruction. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987); *see also*, *Shannon v. United States*, 512 U.S. 573, 585 (1994); *United States v. Olano*, 507 U.S. 725, 740 (1993); *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). In light of the limited nature of the prosecutor's improper questions in the context of the trial, the appropriate instructions given by the trial court, and the overwhelming evidence of petitioner's guilt, the Michigan Court of Appeals's determination that petitioner was not prejudiced by the prosecutor's improper remarks was reasonable. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Presumption of Innocence

Petitioner also contends that he as denied a fair trial because the prosecutor told the jury that the presumption of innocence did not apply to petitioner. During rebuttal argument, the prosecutor stated:

> The presumption of innocense [sic], ladies and gentlemen, is about to end. Because presumption of innocense [sic] is basically a common term for somebody getting a fair trial. Because in the United States you don't lock somebody up without a trial. You don't convict somebody of a crime without a trial. You get a trial by your peers. The fourteen of you.
> You get to confront your witnesses. You get to testify if you choose to. You get to call your own witnesses if you want to. That, ladies and gentlemen, is the presumption of innocense [sic]. And that presumption is about to end because this trial is about to conclude.
> We don't go into a jury room and keep thinking he's innocent, he's innocent, he's innocent. Have they shown he's guilty? No. What we do is we go into a jury room to deliberate and we examine the evidence. We say he's had his trial now what does the evidence show?

Trial Tr., Vol. V, at 971-72. The Michigan Court of Appeals rejected this claim, reasoning that

regardless of the prosecutor's comments, "the trial court properly instructed the jury regarding the presumption of innocence and clearly stated that the jury must take the law as given by the court." *Mesik*, 285 Mich. App. at 542, 775 N.W.2d at 863. The Court should conclude that this determination was reasonable.

Although the prosecutor's comment, suggesting that the presumption of innocence did not continue into deliberations, was erroneous, the Michigan Court of Appeals reasonably concluded that the comment was not so prejudicial as to deprive petitioner of a fair trial. The trial court properly instructed the jury on the presumption of innocence and the burden of proof, and that it should follow the law as given to it by the court. *See* Trial Tr., Vol. V, at 974-75. And as explained above, the evidence against petitioner was overwhelming. In these circumstances, the Michigan Court of Appeals was reasonable in concluding that the prosecutor's comment did not deprive petitioner of a fair trial. *See Hamilton v. Mullins*, 436 F.3d 1181, 1190 (10th Cir. 2006); *Kellogg v. Skon*, 176 F.3d 447, 451 (8th Cir. 1999); *Lowery v. Anderson*, 69 F. Supp. 2d 1078, 1098 (S.D. Ind. 1999), *aff'd*, 225 F.3d 833 (7th Cir. 2000). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.    *Ineffective Assistance of Counsel (Claim IV)*

Petitioner next contends that his trial counsel rendered constitutionally ineffective assistance. Specifically, petitioner contends that counsel was ineffective for failing to object to the improper hearsay evidence and prosecutorial comments. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To

22

establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

"Surmounting Strickland's high bar is never an easy task." *Padilla v.
Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An
ineffective-assistance claim can function as a way to escape rules of waiver and
forfeiture and raise issues not presented at trial, and so the Strickland standard must
be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the
integrity of the very adversary process the right to counsel is meant to serve.
*Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the
standard for judging counsel's representation is a most deferential one. Unlike a later
reviewing court, the attorney observed the relevant proceedings, knew of materials
outside the record, and interacted with the client, with opposing counsel, and with
the judge. It is "all too tempting" to "second-guess counsel's assistance after
conviction or adverse sentence." *Id*., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*,
535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*,
506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether
an attorney's representation amounted to incompetence under "prevailing
professional norms," not whether it deviated from best practices or most common
custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

Establishing that a state court's application of *Strickland* was unreasonable
under § 2254(d) is all the more difficult. The standards created by *Strickland* and §
2254(d) are both "highly deferential," *id*., at 689, 104 S.Ct. 2052; *Lindh v. Murphy*,
521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two
apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420.
The *Strickland* standard is a general one, so the range of reasonable applications is
substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard
against the danger of equating unreasonableness under *Strickland* with
unreasonableness under § 2254(d). When § 2254(d) applies, the question is not
whether counsel's actions were reasonable. The question is whether there is any
reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

2.      *Analysis*

Petitioner contends that counsel was ineffective for failing to object to the improper hearsay

evidence, as well as the prosecutor's improper questions and comments.  The Michigan Court of

Appeals rejected this claim, reasoning that no improper hearsay evidence was admitted, and that

because petitioner was not deprived of a fair trial by the prosecutor's conduct he could not establish

prejudice from counsel's failure to object.  *See Mesik*, 285 Mich. App. at 543, 775 N.W.2d at 863.

This determination was reasonable.  Because petitioner cannot show that the prosecutor's comment

24

deprived him of a fair trial, he likewise cannot show that he was prejudiced by counsel's failure to object. *See White v. Withrow*, No. 00-CV-74231, 2001 WL 902624, at *12 (E.D. Mich. June 22, 2001) (Rosen, J.) (citing *United States v. Nwankwo*, 2 F. Supp. 2d 765, 770 (D. Md. 1998)) (no prejudice from counsel's failure to object to prosecutorial misconduct where prosecutor's comments did not deprive petitioner of a fair trial); *Rich v. Curtis*, No. 99-CV-73363, 2000 WL 1772628, at *8 (E.D. Mich. Oct. 24, 2000) (Friedman, J.) (same). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.      *Vagueness (Claim VI)*

Finally, petitioner contends that the first degree murder statute under which he was convicted is unconstitutionally vague because it does not define the term "murder." The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 519 (1994) (internal quotation omitted); *see also*, *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). A statute is unconstitutionally vague only if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *United States v. Batchelder*, 442 U.S. 114, 123 (1979) (internal quotation omitted); *see also*, *United States v. Williams*, 553 U.S. 285, 304 (2008). "'[P]erfect clarity and precise guidance'" is not required. *Williams*, 553 U.S. at 304 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). To succeed on a vagueness challenge the party asserting the challenge must show that the statute is vague "not in the sense that it requires a person to conform his conduct to an imprecise but

25

comprehensible normative standard, but rather in the sense that no standard of conduct is specified

at all." *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971).

 The standards governing a void-for-vagueness challenge to the statute have recently been

explained by the Supreme Court:

> "A conviction fails to comport with due process if the statute under which it is
> obtained fails to provide a person of ordinary intelligence fair notice of what is
> prohibited, or is so standardless that it authorizes or encourages seriously
> discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).
> We consider whether a statute is vague as applied to the particular facts at issue, for
> "[a] plaintiff who engages in some conduct that is clearly proscribed cannot
> complain of the vagueness of the law as applied to the conduct of others." *Hoffman
> Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982).

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2718-19 (2010) (parallel citations omitted);

*accord Skilling v. United States*, 130 S. Ct. 2896, 2927-28 (2010) (quoting *Kolender v. Lawson*, 461

U.S. 352, 357 (1983)) (alterations by quoting court) ("To satisfy due process, 'a penal statute [must]

define the criminal offense [1] with sufficient definiteness that ordinary people can understand what

conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory

enforcement.' The void-for-vagueness doctrine embraces these requirements."). "[C]larity at the

requisite level may be supplied by judicial gloss on an otherwise uncertain statute, [however] due

process bars courts from applying a novel construction of a criminal statute to conduct that neither

the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States

v. Lanier*, 520 U.S. 259, 266-67 (1997) (citations omitted). Importantly, "[w]hen a state statute has

been construed to forbid identifiable conduct so that interpretation (by the state court) puts these

words into the statute as definitely as if it had been so amended by the legislature, claims of

impermissible vagueness must be judged in that light." *Wainwright v. Stone*, 414 U.S. 21, 23 (1973)

(per curiam) (internal quotation omitted). Under the void-for-vagueness doctrine, "the touchstone

is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Lanier*, 520 U.S. at 267.

  2. *Analysis*

  Petitioner contends that the Michigan first degree murder statute is unconstitutionally vague because the state does not define the term murder. The statute at issue provides, in relevant part:

> A person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life:
> (a) Murder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.
> (b) Murder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, carjacking, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, kidnapping, vulnerable adult abuse in the first and second degree under section 145n, torture under section 85, or aggravated stalking under section 411i.
> (c) A murder of a peace officer or a corrections officer committed while the peace officer or corrections officer is lawfully engaged in the performance of any of his or her duties as a peace officer or corrections officer, knowing that the peace officer or corrections officer is a peace officer or corrections officer engaged in the performance of his or her duty as a peace officer or corrections officer.

MICH. COMP. LAWS § 750.316(1). The statute does not define the term "murder." Petitioner argues that, because of this failure to define the term "murder," the statute is unconstitutionally vague. The Michigan Court of Appeals rejected this claim, reasoning that the term is well defined both by common usage and in the law, and thus petitioner's contention that "any reasonable person would have to guess at the meaning of the word 'murder' or what conduct is likely to expose him or her to criminal liability therefor" was "incredible." *Mesik*, 285 Mich. App. at 547, 775 N.W.2d at 865. This determination was reasonable.

  Although the statute does not define the term murder, the Michigan courts have long explained that "murder" as used in the statute means the common law crime of murder. *See People*

*v. Mendoza*, 468 Mich. 526, 534 n.6, 664 N.W.2d 685, 689 n.6 (2003); *People v. Riddle*, 467 Mich. 116, 125, 649 N.W.2d 30, 37-38 (2002); *People v. Nadeau*, 75 Mich. App. 369, 373, 254 N.W.2d 893, 895 (1977); *People v. King*, 58 Mich. App. 390, 401, 228 N.W.2d 391, 397 (1975). And the Michigan courts have likewise explained that to establish the elements of the common law crime of murder, the prosecution must show that the defendant killed a human being with malice aforethought. In order to show malice aforethought, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. *See People v. Goecke*, 457 Mich. 442, 464, 579 N.W.2d 868, 878 (1998); *People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980).

Petitioner does not contend that this elucidation of the common law crime of murder is itself vague, and that alone ends the matter. *Cf. United States v. Spencer*, 839 F.2d 1341, 1343 (9th Cir. 1988) ("[T]he common-law meaning of a common-law term used in a federal criminal statute is a source of statutory precision in determining whether a statute is impermissibly indefinite."); *Kevorkian v. Thompson*, 947 F. Supp. 1152, 1175 (E.D. Mich. 1997) (Rosen, J.) ("[C]ourts have found it sufficient 'fair notice' to survive a vagueness challenge for the statute to incorporate the common law definition of a crime."). The fact that the term "murder" is not defined in the statute, but rather in case law applying the statute, does not render the statute vague. As noted above, "[w]hen a state statute has been construed to forbid identifiable conduct so that interpretation (by the state court) puts these words into the statute as definitely as if it had been so amended by the legislature, claims of impermissible vagueness must be judged in that light." *Wainwright*, 414 U.S.

28

at 23.  Further, it is well established that a statute need not define each and every term used in the statute to avoid a finding of vagueness.  "When the common meaning of a word provides both adequate notice of the conduct prohibited and standards for enforcement, a statute's failure to define a term will not render the statute unconstitutionally void for vagueness." *United States v. Haun*, 90 F.3d 1096, 1101 (6th Cir.1996).  Because the Michigan courts have provided a consistent, clear interpretation of the term murder, the statute is not unconstitutionally vague.  *See United States ex rel. Almeida v. Rundle*, 383 F.2d 421, 426 (3d Cir. 1967) ("The absence of a definition of murder in the degree statute, which Almeida asserts to be a demonstration of vagueness, is not a defect at all. True, the common law may be imprecise, but that is not a determinative factor here. The common law of murder is well enough defined, after centuries of application.").  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

I.    *Recommendation Regarding Certificate of Appealability*

    1.    *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously

29

less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

    2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the

Court should also conclude that petitioner is not entitled to a certificate of appealability.  In light of the ample opportunity petitioner had to impeach Remer's testimony and the overwhelming evidence of petitioner's guilt, the resolution of petitioner's right to present a defense and confrontation claims is not reasonably debatable.  Because it is clear that petitioner's evidence claims raise only state law issues which are generally not cognizable on habeas review, the resolution of these claims is not reasonably debatable.  Further, in light of the overwhelming evidence of petitioner's guilt and the proper instructions given to the jury by the trial court, the conclusion that petitioner was not prejudiced by the prosecutor's alleged misconduct is not reasonably debatable.  And because of this, it follows that the resolution of petitioner's ineffective assistance claims based on counsel's failure to object is not reasonably debatable.  Finally, because the Michigan murder statute merely codifies the well-defined common law crime of murder, the resolution of petitioner's vagueness challenge is not reasonably debatable.  Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

J.      *Conclusion*

        In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.  If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

        The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of

appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated:   November 30, 2012

**Proof of Service**

The undersigned certifies that a copy of the foregoing **Order** was served on the attorneys and parties of record herein by electronic means or U.S. Mail on November 30, 2012.

s/Kim Grimes
Acting in the Absence of
Eddrey Butts, Case Manager